# EXHIBIT 1

**Philip Kelleher**

| | |
|---|---|
| **From:** | ES Lee <eslee@hanaroshipping.com> |
| **Sent:** | 23 December 2020 12:42 |
| **To:** | jbh6021@hanaroshipping.com |
| **Subject:** | FW: MV Sea Topaz / Metro Ocean ? clean recap CPDD 23 Dec 2020 |
| **Attachments:** | Sea Topaz-(main copy).docx; Sea Topaz-(rider copy).docx |

**From:** Ivan Chan [mailto:Ivan.Chan@howerob.com]
**Sent:** Wednesday, December 23, 2020 12:45 PM
**To:** 'eslee@hanaroshipping.com' <eslee@hanaroshipping.com>
**Cc:** Veer Singh <Veer.Singh@howerob.com>; 'hrs.sec@howerobinson.com' <hrs.sec@howerobinson.com>; 'hrs.hdy@howerobinson.com' <hrs.hdy@howerobinson.com>; dryopsindia@howerobinson.com
**Subject:** RE: MV Sea Topaz / Metro Ocean – clean recap CPDD 23 Dec 2020

ES Lee / Ivan
C: Veer
CC: HPR OPS – SHASHANK (contact at recap bottom)
CC: CP Desk
RE: MV Sea Topaz / Metro Ocean – clean recap CPDD 23 Dec 2020

THANKS FOR YOUR GREAT SUPPORT
PLS TO CONFIRM WE ARE NOW FULLY FIXED WITH BELOW

1. ACCT: METRO OCEAN LIMITED
ADD: FLAT/RM A20/F KIU FU COMMERCIAL BLDG 300 LOCKHART ROAD, WAN CHAI, HONG KONG

PERFORMING VSL:
MV. Sea Topaz
2010blt SDBC
32,484mt DWT, 10.2m SSW, ICE class - ID
flag : PANAMA, CLASS KR
GRT/NRT : 20,198/11,367
LOA / LBP / BM 177.40 / 168.00 / 28.20
Grain 42149 cbm
TPC : 45.1
5/5/h/h
30t x 4 cranes
CO2 fitted

HOLD/HATCH/TANKTOP DIMENSIONS INCLUDING TANKTOP STRENGTHS

TANK TOP STRENGTH (METRIC TONS PER SQM) 20 MT/SQM
STRENGTH OF HATCH COVERS IN METRIC TONS PER SQM
NO.1   4.87 MT / SQM
NO.2~5  3.50 MT / SQM

FLAT TANKTOP DIMENSION

1

NO.1 23.0 M X 5.4 M FWD X 20.2 M AFT
NO.2~4 25.4 M X 21.8 M
NO.5 26.1 M X 21.8 FWD X 8.4 AFT

HATCH SIZES:
NO. 1    14.4 M X 15.2 M
NO. 2 ~ 5 19.2 M X 21 M

GRAIN /BALE BDOWN IN CBM
NO. 1 6,196.6 / 6,010.7
NO. 2 9,171.2 / 8,896.1
NO. 3 9,232.5 / 8,955.5
NO. 4 9,229.7 / 8,952.8
NO. 5 8,319.2 / 8,069.6
TOTAL 42,149.2 / 40,884.7

Speed/Consumption at Sea
Laden - Abt 12.50 kts on abt 26.0 mt VLSFO(380CST, <0.5% Sulphur) + abt 0.1 mt LSMGO
Ballast - Abt 13.00 kts on abt 26.0 mt VLSFO(380CST, <0.5% Sulphur) + abt 0.1 mt LSMGO
In good weather conditions up to and including BF4 and DSS 3 and no negative swell / no adverse current
the vessel entitles to use more FO/MGO at narrow / shallow / busy water area, canals, in and out of ports
and engine starting / stopping at masters discretion whenever necessary

eco speed
abt 12.00 (L)/12.50 (B) kts on abt 20.00 mt VLSFO(380CST, <0.5% Sulphur)  + abt 0.1mt LSMGO

Port Consumption
Idle abt 2.0 mt VLSFO(380CST, <0.5% Sulphur) + Boiler abt 1.8mt VLSFO(380CST, <0.5% Sulphur) + abt 0.1
mt LSMGO
Working abt 3.5 mt VLSFO(380CST, <0.5% Sulphur)  + Boiler abt 1.8mt VLSFO(380CST, <0.5% Sulphur) + abt
0.1 mt LSMGO

All details about given in good faith

2 OWNERS:
Hanaro Shiping Co., Ltd.
ADD. 12F #35 Cheonggyecheon-ro, Jongro-gu, Seoul, 110-790, Korea
TEL DIR)822-735-1504  FAX) 82-2-735-5420
E-MAIL : handy@hanaroshipping.com

3. DELY: DLOSP CEBU , PHILIPPINES ATDNSHINC

4. LAY/CAN: 0001lt 25 Dec – 2359lt 26 DEC 2020

5. DURATION: 1 TCT VIA SP(S), SB(S), SA(S), AAAA,AWIWL WITH HARMLESS, LAWFUL CARGO ALWAYS W/I
INL (INSTITUTE NAVIGATIONAL LIMITS).
TRADING FIRM INTENTION: VIA INDONESIA WITH LAWFUL & HARMLESS COAL TO BANGLADESH. DUR ABT
30 DAYS WOG.

6. REDELIVERY:DLOSP 1 SP BANGLADESH PICO

7 HIRE USD 8200 DAILY INCLOT
- 1ST 20DAYS HIRE WITHOUT PAYMENT OF BOD TO BE PAID W/I 3 BANKING DAYS AFT VSLS DELY.
- FURTHER HIRE TO BE PAID 15 DAYS IN ADVANCE, BALANCE MINOR HIRE TO BE SETTLED WITHIN 3 BANKING DAYS AFT VSLS REDELIVERY.

8. BOD ABT: LSFO : 400-430 MT / MDO 35-40 MT
BUNKERS ON REDELIVERY TO BE ABT SAME BUNKERS ON DELIVERY BUNKER PRICES: -LSFO USD 402.50 PMT, -MGO USD 440.00 PMT

CHTRS SHALL NOT PAY VALUE OF BUNKER ON DELIVERY BUT CHARTERERS GUARANTEE TO REPLENISH THE VESSEL WITH THE BUNKER BEFORE VSL REELIVERY, SO AS TO REDELIVER THE VESSEL WITH ABT THE SAME BUNKER AS IT WAS ONBOARD ON DELIVERY. (ABT MEANS 5% MOL FOR IFO, FOR MDO, SAME TO BE REDELIVERED AS ON BOARD DUE TO ONLY MINOR QUANTITY REQUIRED FOR THE WHOLE VOY.).

CHARTERERS/OWNRS TO HAVE THE OPTION TO BUNKER THE VESSEL PRIOR TO DELIVERY/REDELIVERY THEM AS TIME CHARTER AS LONG AS SAME IS NOT INTERFERING WITH CHARTERERS/OWNERS' DISCHARGING OPERATIONS.

MASTER/VESSEL HAS THE LIBERTY TO BURN MGO FOR MAIN ENGINE WHEN MANOUVERING IN SHALLOW/NARROW/WATERS/CANALS/RIVERS AND IN OR OUT OF PORTS.

CHRTRS WILL SUPPLY THE VESSEL AT SINGAPORE, OWNS MIGHT TAKE SOME BUNKERS FOR THEIR ACCT. IF OWNER TAKE BUNKER TOO, PLS CONFIRM OWNER TO SHARE THE TIME TAKEN PRO RATA BSS BUNKERS QUANTITY REPLENISHED CHRTR/OWNER EACH.

9.VESSEL'S HOLD LATEST ON ARRIVAL AT FIRST LOADING PORT TO BE CLEAN/SWEPT/WASHED, DRIED, FREE OF ACCESSIBLE LOOSE RUST FLAKES/SCALE AND RESIDUES OF PREVIOUS CARGO(ES)/INFESTATION AND READY TO LOAD ALL PERMITTED CARGO(ES). IN CASE OF THE VESSEL HOLDS ARE REJECTED AT LOADING PORT BY SHIPPER'S SURVEYOR, VESSEL TO BE OFF-HIRED FROM THE TIME OF REJECTION UNTIL THE HOLDS ARE PASSED/ACCEPTED BY THEM AND ALL PROVED EXTRA EXPENSES DIRECTLY RELATED TO UNREADINESS OF HOLDS TO BE FOR OWNERS' ACCOUNT, BUT IN ANY CASE A STEVEDORING EXTRA EXPENSE SHALL BE LIMITED BY ONE SHIFT.

10. ILOHC: CHARTERERS HAVE THE OPTION OF REDELIVERING THE VESSEL IN AN UNCLEAN STATE. CHARTERERS PAYING USD 3,500 LUMPSUM AS COMPENSATION INCLUDING REMOVAL, DISPOSAL OF DUNNAGE, LASHING MATERIAL, DEBRIS.

11. CEV USD 1,200 PER 30 DAYS OR PRO RATA.

12. AT LOADING PORT, MASTER TO AUTHORIZE THE AGENT TO ISSUE THE BS/L WITH HIS AUTHORIZATION LETTER. BS/L TO BE STRICTLY IN ACCORDANCE WITH THE M/R.

IF THE ORIGINAL BS/L ARE NOT AVAILABLE BY THE TIME OF THE VESSEL'S ARRIVAL AT PORT OF DISCHARGE, THE OWNERS SHOULD ALLOW TO DISCHARGE THE CARGO WITHOUT PRESENTATION OF THE ORIGINAL BS/L BUT AGAINST PROVIDING WITH THE CHARTERERS' LETTER OF INDEMNITY (HEREINAFTER AS ?LOI?) ISSUED IN OWNER'S FORM AND WORDING TOGETHER WITH THE COPY OF SIGNED BS/L. THE LOI TO BE STAMPED AND SIGNED BY INK BY THE CHARTERERS' DULY AUTHORIZED PERSON.

13. THE VSL SHALL NOT CHANGE OWNERSHIP, FLAG, CLASS, TECHNICAL AND/OR CREW MANAGEMENT FROM THE TIME OF THIS FIXTURE OR DURING THE CURRENCY OF THIS C/P. NO DRY DOCKING DURING THE CURRENCY OF THIS CP EXCEPT IN CASE OF EMERGENCY.

14. OWRS WARRANT THAT THE VSLS HOLDS ARE CLEAR OF ANY FITTINGS/SUPERSTRUCTURE SUCH AS CARDECK, CURTAIN PLATES WHATSOEVER.

15. OWRS CONFIRM VSLS CRANES ARE IN GOOD WORKING ORDER AND AVAILABLE FOR CHRTS USE FREE OF CHARGES.

16. BIMCO STANDARD ISM / ISPS / BIMCO STOWAWAY TO APPLY BIMCO CANCELLING CLAUSE 2002 (CODE NAME: CANCELCON 2002) TO APPLY.
BIMCO STOWAWAYS CLAUSE' BIMCO DOUBLE-BANKING CLAUSE; ICA; BIMCO-LMAA CLAUSE TO BE INCORPORATED IN CHARTER PARTY BIMCO STEVEDORE DAMAGE CLAUSE FOR TIME CHARTER TO APPLY. BIMCO DUNNAGE REMOVAL CLAUSE FOR TIME CHARTER PARTIES TO APPLY.

17. JOINT ON-HIRE AND OFF-HIRE SURVEYS ARE TO BE HELD TO ASCERTAIN THE QUANTITIES OF BUNKERS ROB AND/OR CONDITION OF CARGO HOLDS ON DELIVERY AND REDELIVERY.
THE ON-HIRE/OFF-HIRE SURVEYS ARE TO BE HELD AT THE DELIVERY/REDELIVERY PORT OR FIRST LOADING/DISCHARGING PORT AND SURVEYOR TO BE NOMINATED BY THE CHTRS, COST TO BE SHARED 50/50 BETWEEN OWNERS AND CHARTERERS, TIME TAKEN FOR ON HIRE SURVEY TO BE FOR CHRTRS ACCT. AND TIME TAKEN FOR OFF HIRE SURVEY TO BE FOR CHRTRS ACCT.

18. DELY/REDELY/ACTUAL TIME ON HIRE TO BE COMPUTED BASIS GMT. LAYCAN'S BASIS LOCAL TIME.

19. OWNERS TO GIVE CHTRS DAILY DEF NOTICE OF DELY. CHTRS TO GIVE OWNERS 10/7 DAYS APPROXIMATE AND 5/3/2/1 DAYS DEF NOTICE OF REDELY.

20. GENERAL AVERAGE TO BE SETTLED IN LONDON IN ACCORDANCE WITH ENGLISH LAW AND YORK-ANTWERP RULES 1994 WITH SUBSEQUENT AMENDMENTS AND ALTERATIONS.
THIS CHARTER PARTY SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH ENGLISH LAW AND ANY DISPUTES ARISING OUT OF THIS CHARTER PARTY SHALL BE REFERRED TO ARBITRATION IN LONDON WITH PROCEDURE IN ACCORDANCE WITH BIMCO/L.M.A.A. CLAUSE.

21. CARGO CLAUSE: IT IS MUTUALLY, CLEARLY UNDERSTOOD AND AGREED THAT ONLY HARMLESS/LAWFUL/NON-DANGEROUS COAL IN BULK IS ALLOWED TO CARRY. THE CARGO CARRIED TO COMPLY WITH LATEST IMO AND LOCAL REGULATIONS, IMSBC CODE REQUIREMENTS & TO BE SHIPPED ON THE VESSEL IN ACCORDANCE WITH THE SHIPS CERTIFICATES/TANKTOP STRENGTH/TRIM.

22. DURING THE LOADING MASTER HAS RIGHT TO REJECT ANY UNSOUND/DAMAGED CARGO AND CHARTERERS/SHIPPERS IMMEDIATELY TO PROVIDE SOUND REPLACEMENT.
VESSEL'S DELAY FROM THE ABOVE TO BE FOR CHARTERERS' TIME AND EXPENSES.

23. ANY AND ALL SURVEYORS APPOINTED BY CHARTERERS/SUB-CHARTERERS FOR WHATEVER REASONS INCLUDING, BUT NOT LIMITED TO CARGO DAMAGE, TALLY SURVEY OR BUNKER SURVEY, TO BE REPORTED TO THE OWNERS IN WRITTEN IN A GOOD TIME WITH GIVEN SURVEYORS' FULL CONTACT DETAILS AND TIME/DATE OF ARRIVING ONBOARD.

24. OTHERWISE TERMS AS PER OWNRS CP PRO FORMA CP WITH LOGICAL AMENDMENTS AND CORRECTIONS AS PER AGREED TERMS ALONG WITH FOLL ALTERATIONS:

++++++
RIDER CL.
CL. 103
DELETE "(AWT or WNI)"
...mutually agree to appoint another Ocean Routes company WITH COST SHARED BY 50:50
DELETE "Charterers to provide supporting documents to substantiate their speed claims, if any, and same to be dealt with separately and not to be deducted from hire unless mutually agreed"

CL. 110
(i) 20 days
(ii) 25 days
+++++++

25. 3.75% ADDRESS COMMISSION + 1.25% TO HOWE ROBINSON PARTNERS

//END//

Kindly send all Post fixture/ operations emails at: dryopsindia@howerobinson.com

Post-fixture matters will be handled by :

SHASHANK KUMAR BIMAL | OPERATION | INDIA
HOWE ROBINSON SHIPPING INDIA PVT LTD | INDIA | PHONE: +91 124 4646927 | MOBILE: +91 9643330351 | shashank.singh@howerob.com

IMPORTANT: OPERATIONS:
IT IS ESSENTIAL THAT ALL MESSAGES IN RESPECT OF OPERATIONS BE SENT TO THE RELEVANT EMAIL ADDRESSES (dryopsindia@howerobinson.com). WE CAN ACCEPT NO RESPONSIBILITY FOR DELAY OR OTHER CONSEQUENCES IF MESSAGES ARE SENT TO ANY OTHER EMAIL ADDRESS WITHIN THE COMPANY. PLEASE ENSURE THAT ALL IMPORTANT OPERATIONAL MESSAGES ARE FOLLOWED UP WITH A TELEPHONE CALL ESPECIALLY AFTER OFFICE HOURS

PLEASE NOTE WE WILL COLLECT OUR COMMISSION FROM OWNERS.
MANY TKS FOR THE FIXTURE AND YR KIND SUPPORT.

Best Regards
IVAN CHAN
HOWE ROBINSON PARTNERS (HONG KONG)
DIR +852 35551182
MOB +852 92067299
EML hrs.hdy@howerobinson.com
PRIVATE EML ivan.chan@howerob.com
SKYPE leader.ivanchan

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# Time Charter

### GOVERNMENT FORM

*Approved by the New York Produce Exchange*

**November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946**

1  **This Charter Party**, made and concluded in *Seoul, Korea*.........................24th day of.....*July* ......~~19~~ *2013* .........
2  Between *Hanaro Shipping Co., Ltd., Seoul Korea*.................... *as*.................................................................................
3  Owners of the good *Panama flag* ...................~~Steamship~~/Motorship ...*"Sea Topaz"*... ~~of.~~ built 2010, China.....................
4  of......*20,198*........tons gross register, and.....*11,367*........tons net register, ~~having engines of~~....................~~indicated horse power~~
5  and with hull, machinery and equipment in a thoroughly efficient state, and classed *Bulk Carrier* .................................................
6  at .........of about.......*(See Clause 63)*....cubic *meters* ~~feet bale~~ capacity, and about   ....  *(See Clause 63)*.........ton ~~of 2240 lbs.~~
7  deadweight capacity (cargo and bunkers, including fresh water ~~and stores not exceeding one and one-half percent of ship's deadweight capacity,~~
8  ~~allowing a minimum of fifty tons)~~ on a draft of....~~feet~~ *meters* ~~inches~~ on *salt* Summer freeboard, ~~inclusive of permanent bunkers,~~
9  ~~which are of the capacity of about~~ ..................................................tons of fuel, and capable of steaming, fully laden, under good weather
10  ~~conditions about....knots on a consumption of about ...... tons of best welsh coal best grade fuel oil best grade Diesel oil,~~ *(See Clause 63)*
11  now  *trading*.........................................................................................................................................................
12  .......and  ...................  *as*................Charterers of the City of *Seoul, Korea* .................  ..................................

13  **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14  ~~about.~~ *time charter period trip via safe port(s),* ~~safe berth(s), safe anchorage(s), safe place(s)~~ *always safely afloat, always within*
    *Institute Warranty Limits.*
15  *with general and harmless cargoes, duration about 23/about 25months(about means +/- 15 days) in Charterers' option* within below
   mentioned trading limits.
16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17  the fulfillment of this Charter Party.
18  Vessel to be placed at the disposal of the Charterers, ~~at~~ *on dropping last outward sea pilot one safe port Aden/Japan, Skaw/full Mediterranean*
    *including Black Sea, Boston/Buenos Aires, Jorf Lasfar/Cape Town, Vancouver BC/Punta Arenas, Mombasa/Durban range*
19  *any time day or night Sundays and Holidays included* ...................................................................................
20  ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all time of tide, except as otherwise provided in clause No. 6), as~~
21  ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her delivery *this*
    *Charter period* to be
22  ready to receive *any permissible* cargo with clean-swept holds *washed down by fresh water and dried up* and tight, staunch, strong and
23  in every way fitted for the *ordinary cargo* service having water ballast, ~~winches~~ and
24  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same
    time (and with full complement of officers, seamen, engineers ~~and firemen~~ for a vessel of her tonnage), *throughout the period of this Charter vessel* to
25  be employed, in carrying lawful merchant-
    dise, ~~including petroleum or its products, in proper containers,~~ excluding *(See Clause 89)*.........................................................
26  (vessel is not to be employed in the carriage of Live Stock, but ~~Charterers are to have the privilege of shipping a small number on deck at their risk,~~
27  ~~all necessary fittings and other requirements to be for account of Charterers),~~ in such lawful trades, between safe port and/or ports ~~in British North~~
28  ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
29  ~~Mexico, and/or South America~~............................................................................................................... and/or Europe
30  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~
31  ~~October 31st and may 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~
32  *within Institute Warranty Limits, (See Clause 88)*
33  .................................................................................................................................................................
34  .................................................................................................................................................................
35  as the Charterers or their Agents shall direct, on the following conditions:
36      1. That the Owners shall provide and pay for all provisions, *drinking water* wages and consular shipping and discharging fees of the Crew;
    shall pay for the
37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38  the vessel in a thoroughly efficient state in hull, machinery and equipment *with all certificates necessary to comply with requirements as ports of*
    *call and canal* for and during the service.
39      2. That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges,
    Pilotages, Agencies, *Canal tolls,* Commisions.
40  Consular Charges (except those pertaining to the Crew *and flag*), and all other usual expenses except those before stated, but when the vessel puts into
41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43  charter to be for Charterers account All other fumigations to be for Charterers account after vessel has been on charter for a continuous period
44  ~~of six months or more.~~ *(See Clause 40)*
45      Charterers are to provide necessary dunnage *lashing materials* and shifting boards, also any extra fittings requisite for a special trade
    or unusual cargo, but
46  Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47  for dunnage, they making good any damage thereto.
48      3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~...........................~~tons and not more than~~

50 ...........................~~tons and to be re delivered with not less than~~...........................~~tons and not more than~~...........tons.*(See Clause 30)*

51     4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of   *USD XX,XXX daily, including overtime, payable 15 days in advance*

52 ...........................................~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~

53 ~~stores, on~~.......................~~summer freeboard, per Calendar Month~~, commencing on and from the day *any time* of her delivery, as aforesaid, and at

54 and after the same rate for any part of a *day* ~~month~~; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) ~~at~~ *on dropping last outward sea pilot one safe port Aden/Japan, Skaw/full Mediterranean including Black Sea, Boston/Buenos Aires, Jorf Lasfar/CapeTown, Vancouver BC/Punta Arenas, Mombasa/Durban range in Charterers' option any time day or night Sundays and Holidays included*

56 ...................~~unless otherwise mutually agreed.~~ Charterers are to give Owners not less than *20/15/10*....days *approximate notice with intended redelivery port and 7/5/3/2/1 days definite*

57 notice of vessels expected date of re-delivery, and probable port.

58     5. Payment of said hire to be made in *as per Clause 78* ~~New York~~ in cash in United States Currency semi-monthly in advance, and for the last half month or

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual *upto expected redelivery time date* and regular payment of the

61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, *after serving minimum two banking days notice* without prejudice to any claim they (the Owners) may otherwise have on the Charterers ~~Time to count from 7 a.m. on the working day~~

63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65     Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, *and/or Owners* by the Charterers or their Agents, subject

66 to 2¼% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67 of such advances.

68     6. That the cargo or cargoes be laden and/or discharged in any safe dock or at any safe wharf or safe place that Charterers or their Agents

69 may direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely.

70 ~~lie aground.~~

71     7. That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74 ~~paying Owners~~.........~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75 ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

76     8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards *vessel's* employment

78 and agency; and Charterers are to load, stow, ~~and~~ trim, *secure, tally, discharge, lash/unlash and dunnage* the cargo at their expense under the supervision of the Captain, *if he is requested to do so by Charterers and* who is to sign Bills of Lading for

79 cargo as presented, in *strict* conformity with Mate's ~~or Tally Clerk's~~ receipts,

80     9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments. *But this provision does not affect Charterers' rights to advance any claim caused by the conduct of the Master.*

82     10. That the Charterers shall have permission to appoint a Supercargo who shall accompany the vessel *at his own risk and standard L.O.I. to be signed and loaded with Master on his boarding* and see that voyage are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84 rate of *USD10.00* -per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying ...........................*Owners USD 1,500 per 30 days or pro rata toward cables/victualling/entertainment* ~~at the current rate per meal, for all such victualling.~~ *(See Clause 107)*

86 11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88 terers, their Agents or Supercargo, when required, with *legible deck and engine* a true copy of daily Logs, *in English Language,* showing the course of the vessel and distance run and the con-

89 sumption of fuel.

90     12. That the Captain shall use diligence in caring for the ventilation of the cargo.

91     13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~...................................................................

92 ...................................................................................................................................................................

93 ~~on giving written notice thereof to the Owners or their Agents~~.........~~days previous to the expiration of the first named term, or any declared option.~~

94     14. That if required by Charterers, time not to commence before *0001 hours on the 05th of September, 2013* and should vessel

95 not have *been delivered* ~~given written notice of readiness~~ on or before *2400 hours on the 05th of October, 2013 which to be narrowed as 10 days spread lay/can when 20 days prenotice of delivery* ~~but not later than 4 p.m.—~~ Charterers or

96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97     15. That in the event of the loss of time from *and/or default of Owners and/or strike or sabotage by Officers/crew of deficiency of ship's* ~~of men or~~ stores, fire, breakdown or damage to hull, machinery or equipment,

98 grounding, detention by average accidents to ship or cargo drydocking for the purpose of examination or painting bottom, or by any other cause

*whatsoever for which Owners are found liable under terms of this Charter Party and unless caused by Charterers*

99 preventing the full working of the vessel the payment of hire shall cease for the *actual* time thereby lost; and if upon the voyage the speed be reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra *direct related* fuel consumed in consequence

101 thereof, and all extra expenses shall be deducted from the hire. *(See Clause 52)*

102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.

107 17. That ~~should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to~~  *G.A./Arbitration in London.*
*English Law to apply and award given by the arbitrators shall be final and binding on the both parties. The arbitrators shall be*
*shipping men conversant with shipping matters. Owners understanding is that such party to appoint one person and the 3rd to be*
*appointed by the two so chosen,* ~~three persons at New York,~~ *LMAA for claims not exceeding the amount of USD50,000*
*acceptance of delivery by Charterers shall not be constituted waiver of Owners' obligations hereunder this charter party*
108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court.   The Arbitrators shall be commercial men.~~
110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights/**sub-hires** for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated *in London according to York-Antwerp Rules of 1994 or any amendments thereto* ~~and~~
~~settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116 ~~York-Antwerp Rules 1924, at such port or place in the United States as may be selected by the carrier,~~ and as to matters not provided for by these
117 Rules, according to the laws and usages at the port of *London* ~~New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.   Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~
126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods.   If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers ,hereunder.~~
132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *It is understood that Charter*
133 *ire is not to be contributed to General Average.*
133 20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the
134 cost of replacing same, to be allowed by Owners.
135 21. That ~~as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 *No drydocking during this Charter period except in case of emergency or if/when mutually agreed between Owners and*
*Charterers.*
139 ....................................................................................................................................................................................................................
140 22. Owners shall maintain the gear of the ship as fitted, providing gear *maximum in accordance with description Clause* (for all *cranes*
*and power* ~~derricks) capable of handling lifts up to three tons,~~ also
141 providing ropes, falls, slings and blocks *as on board.* If vessel is fitted with *cranes* ~~derricks~~ capable of handling heavier lifts, Owners are to
provide necessary gear for
142 same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide ~~on the vessel~~ *as on board*
*sufficient light for night work free of expense to Charterers* ~~lanterns and oil for~~
143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
144 Charterers to have the use of any gear on board the vessel
145 23. ~~Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~
146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches,~~ shore Winchmen to be *employed and* paid by Charterers. In the event of a disabled
~~winch or winches, or~~
149 insufficient power to operate winches, Owners to pay for shore *appliances* ~~engine, or engines,~~ in lieu thereof, if required, and pay any loss of time

occasioned *(See Clause 51)*
150 thereby.
151     24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~

155                                           ~~**U.S.A. Clause Paramount**~~
156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160                                  ~~**Both-to-Blame Collision Clause**~~
161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~
167     25. The vessel shall not be required to in*force ice nor follow ice breaker nor* enter any ice-bound port, or any port where lights or light-ships have
       been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port, or to get out after having completed loading or discharging. *The Vessel shall not be required to enter or remain in Nakhodka port or*
*area if on account of ice there is, in the Nakhodka Port Authority's sole discretion, a risk that, in the ordinary course of events,*
*the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading. If, on account of*
*ice, the Nakhodka Port Authority in it's sole discretion considers it is unsafe to proceed to, enter or remain at the place of loading*
*for fear of the Vessel being frozen in and/or damaged, Master, after mutual agreement between Charterers And Owners, is to sail*
*to the nearest mutually agreed ice-free and safe place and there await the Charterers' instructions remaining on-hire. If any*
*damage on hull and machinery due to ice to be for charterers' responsibility and if any time lost to be for charterers' time and*
*vessel to remain on-hire.*
170     26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.
172     27. A commission of *1.25* ~~2½~~ per cent is payable by the Vessel and Owners to..., *Seoul* ...…..................................
173 …………………………………………………………………………………………………………………………………………
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
    28. An address commission of *2.5* ~~2½~~ per cent payable to...*the Charterers* ...on the hire earned and paid under this Charter.


    *Additional Clauses 29-126, as attached, are to be to be fully incorporated in this Charter Party.*




**OWNERS :**                                              **CHARTERERS :**
HANARO SHIPPING CO., LTD.



--------------------------------------                         --------------------------------------------------------


This Charter Party is a computer generated copy of the NYPE(Revised 3rd October, 1946) form printed under license from the Association of Ship Brokers & Agents(U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

**Clause 29.   Delete**


**Clause 30.   BUNKERS PRICE & QUANTITY**
Bunkers on redelivery to be about same quantities as bunkers on delivery.

Estimated bunkers on delivery about     metric tons IFO and about     metric tons MDO without guarantee.
Bunker prices at both delivery and redelivery to be USD   PMT OF IFO and USD   PMT OF MDO respectively.

In case RMG 380 is not available, then the Charterers to supply RME 180 instead of RMG 380. However in South Africa only where RME 180 may not be available, Charterers may be allowed to supply RMF 180 with prior consent of Owners.

**Clause 31.   IN LIEU OF HOLD CLEANING**
Charterers have the option to redeliver the vessel unclean against paying USD 4,000 lumpsum in lieu of hold cleaning including removal of all dunnage/lashing materials/debris.


Intermediate hold cleaning:
Upon completion of discharge of each cargo, the crew shall render customary assistance in cleaning cargo holds in preparation for next loading at Charterers' risk/account/responsibility if required by Charterers and if not prevented by any regulation, whatsoever. Such cleaning shall be performed while the vessel is en route to next loading port, provided the weather permits. The Charterers shall pay to the Owners USD 500 per hold for the intermediate hold cleaning performed. The crew will endeavor to effect such cleaning as best as possible.


**Clause 32.   JOINT ON-HIRE AND OFF-HIRE SURVEYS**
Owners and Charterers are to hold a joint on-hire and off-hire survey (Hull and Bunkers) by an independent surveyor for joint account with costs to be shared on 50/50 basis. On-hire survey to be for Owners' time if actual time loss occurred and off-hire survey to be for Charterers' time.

Delivery time and redelivery time to be local time but converted to G.M.T. for means of calculation of on-hire time.


**Clause 33.   STEVEDORE DAMAGE**
Notwithstanding anything to the contrary in this Charter Party or by operation of the law, Charterers to remain responsible for stevedore damage as stated hereunder:
Stevedores to be appointed and paid for by the Charterers but to work under the supervision of the Master. Should any damage be caused by the stevedores to the vessel or her fittings, then the Master has to let the stevedores try and repair the damage and will try and settle the matter directly with them in the first instance.   If the damage cannot be repaired by the stevedores, then the Master must endeavour to obtain written acknowledgement of the damage and liability from the stevedores.   Master has to notify the Charterers or their agents in writing of such damage within 48 hours after such damage occurs or in case of hidden damage as soon as the same is discovered but in any case no later than the time of vessels sailing of last discharging port of each voyage/redelivery on last voyage.
The Charterers have the privilege of redelivering the vessel without repairing the stevedores' damage for which the Charterers are responsible, incurred during the currency of this Charter as long as the damage does not affect the seaworthiness of the vessel, class, tradingworthiness.   But the Charterers undertake to reimburse the cost of repairs against the production of repair bills by a dockyard, which is however to be in conformity with the off-hire surveyor's report with respect to the extend of such damage and the bill/cost not to be unreasonable unless otherwise agreed and Owners endeavour to minimize the repairing cost.
In case the stevedores' damage affects the vessel's seaworthiness, class, tradingworthiness, then such damage to be repaired prior to sailing the port of occurrence at Charterers' time, risk and expense to class surveyor's satisfaction.


**Clause 34.   CARGO GEAR & EQUIPMENT**
Vessel's cargo gear, all other equipment to comply with the regulations and/or requirement in effect at port of call and canals and the vessel is at all times in possession of valid up-to-date certificates onboard necessary to comply with such regulations and/or requirement.


**Clause 35.   BOYCOTT**
Should the vessel be boycotted, picketed, blacklisted or similar incident at any port or place by shore and/or port labours and/or tug boats and/or pilots, or by the government and/or any authority by reason of the terms and

1

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

conditions of which members of the Officer/crew were employed, vessel has PNO-TCC(Panhelenic Seamans Federation) accepted by ITF or by reason of other vessels under the same ownership, management, operation or control, or by reason of vessel's fitting and/or her other equipment, all directly related expenses for the vessel but not included any opportunity loss incurred by the Charterers, and any direct expenses incurred therefrom to be for Owners' account and Charterers are entitled to put the vessel off-hire for any time lost by such reason.

**Clause 36.   ELIGIBILITY FOR BUNKERING**
Owners confirm that vessel is eligible for bunkers in the United States of America, its territories and possessions in accordance with governing export control regulation also Owners confirm that vessel is eligible for bunkers in any other countries, if required.

**Clause 37.   OIL SPILLAGE**
With regard to oil pollution, Owners guarantee a valid certificate of financial responsibility in compliance with requirements of U.S. Water Quality Improvement Act of 1970 and OPA '90 and any amendments thereto.

**Clause 38.**
**DELETED.**

**Clause 39.   CUBA/ISRAEL BLACK LIST**
To the best of their knowledge, Owners confirm that this vessel has not traded Israel and is not blacklisted by the boycott league in Darnascus.

**Clause 40.   DERATTING CERTIFICATE**
The vessel to be delivered with valid deratisation exemption certificate on board and if this does not cover the whole period of this Charter and renewal of certificate and sanitary inspection certificate or fumigation is necessary, cost of same and delay of the vessel and any expenses incurred therefrom to be for Owners' account.

**Clause 41.   QUARANTINE**
Normal quarantine time and expenses to enter the port to be for Charterers' account.   But any time of detention and expenses for quarantine due to pestilence illness, etc, of Master, Officers and crew to be for Owners' account.

**Clause 42.   VACCINATION**
Owners to arrange at their expenses that Master, Officers and crew of the vessel hold valid vaccination certificates against yellow fever, smallpox, cholera or other necessary health certificates during this Charter.

**Clause 43.   STOWAGE COLLECTION OF DUNNAGE, ETC**
Owners and Master to undertake best efforts to co-operate with Charterers and Master to make best efforts to collect, restore and provide any useful dunnage, lashing, etc., including pre-slings/wire sling, not broken for next use after completion of the voyage, during the currency of this Charter, if requested to do so by Charterers.

**Clause 44.   HATCH OPENING/CLOSING, ETC**
Provided time and safety permit, before and upon arrival at a port, vessel's Officers/crew to shape up vessel's hatches, cranes and gangway in order to commence loading and/or discharging without delay.   Opening/closing of all hatch covers may be done by Officers/crew provided shore regulations permit.

**Clause 45.   SMUGGLING**
Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account if caused by Charterers' supercargo, their staff or Charterers' agent, or to be for Owners' account if caused by Officers and/or crew or Owners' agents.

**Clause 46.   GANGWAY WATCHMEN**
Gangway watchmen if requested by Owners/Master to be for Owners' account, other cases including compulsory gangway watchmen to be for Charterers' account.

**Clause 47.   OWNERS' AGENT**
Owners to appoint the Owners' agents to attend all Owners matters such as General Average, dry-docking,

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

hospitalization and repatriation of crew, repair, supply of vessel's stores and provisions, etc. In case Owners are unable to arrange same, Charterers to agree to have their agents attend such matters with Owners paying actual expenses on the basis of prevailing tariff. However, Charterers' agents to attend small matters such as delivery of crew mails without charging Owners any fee.

Notwithstanding the above, Charterers' agents to assist with crew charges and Owners paying for the services at cost.

### Clause 48.   OWNERS DISBURSEMENT
Owners/master to settle if any owners' expenses, but if requested by owners/master, charterers shall assist owners' matter for minor matter which expenses to be deducted by supporting vouchers/evidence.

### Clause 49.   DEVIATION PUT BACK
In the event of loss of time either in port or at sea deviation from the course of the voyage or putting back whilst on voyage, caused by sickness of or an accident to or misconduct by Master/Officers/crew, or caused by stowaway, refugee or any person on board vessel other than persons travelling by request of Charterers or by reason of the refusal of Master or Officer(s) or crew to perform their duties or of an accident or breakdown to the vessel or drydocking or periodical survey, the hire shall be suspended from the time of inefficiency in port or at sea, deviation or putting back until vessel is again efficient in the same position or regains the line of voyage whichever shorter distance for a port where the vessel is originally destined for and voyage resumed therefrom. All expenses incurred, including bunkers consumed during such period of suspension shall be for Owners' account.

It is expressly agreed that if the vessel resumes her voyage from a point closer to her original destination then any time and bunkers saved shall be credited to the Owners.

### Clause 50.   SAVING LIFE REFUGEE
Owners shall have the liberty to deviate for the purpose of saving life at sea and landing the person saved. But in case found the person is refugee, any time hereby lost and extra expenses to be shared equally with parties involved in this Charter chain.

### Clause 51.   WINCH BREAKDOWN
In the event of breakdown of winch or winches by reason of disablement or insufficient power, the hire to be reduced pro rata for the period of such inefficiency in relation to the number of winch(es) available. This does not exempt Owners from liability for the cost of hiring shore appliances, if required by Charterers, in accordance with Clause 23. If shore appliances are hired by Owners, the hire of the vessel to be paid in full deducting actual time lost by breakdown. Charterers to discuss with Owners the cost of any shore gear prior to Charterers hiring same.

### Clause 52.   SEIZURE, DETENTION, ARREST
Should the vessel be seized or detained or arrested or delayed by any authority during the currency of this Charter period, all time lost by this reason shall be treated off-hire until the time of her release, unless such seizure or detention or arrest or delay is occasioned by any act or omission or default of Charterers or their agents. Any extra expenses incurred by and/or during above seizure or detention or arrest or delay shall be for Owner's account, unless caused by Charterers as above.

### Clause 53.   REQUISITION
Should the vessel be requisitioned by the government of the vessel's flag during the currency of this Charter, she shall be off-hire during the period of such requisition and any hire or other compensation paid by any government or governmental authority in respect of such requisition shall be for Owners' account. However, Charterers have the option of cancelling the balance period of this Charter.

### Clause 54.   MAJOR WAR
If major war breaks out between any two or more of the following countries and provided same has a direct bearing on the non-fulfillment of this Charter Party:

United Kingdom, U.S.A., Russia, People's Republic of China, Japan, Taiwan and flag of the vessel directly affecting the performances of this Charter, both Owners and Charterers shall have the option of cancelling this Charter whereupon Charterers shall redeliver the vessel to Owners, if she has cargo on board, after discharging thereof at destination, or if debarred from reaching or entering it, at a near open and safe port as directed by Charterers, or if she has no cargo on board, at a port at which she stays or if at sea at a near and safe port as directed by Charterers. In all cases hire shall be paid until vessel's redelivery.

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

**Clause 55.   WAR RISK INSURANCE AND CREW WAR BONUS**
Basic annual war risk insurance on vessel and/or crew to be for Owners' account. Any extra/additional war risk insurance premium on vessel and/or crew and/or closure/blocking/trapping insurance charged by Owners Underwriters in respect of calling the breach areas under this Charter Party to be for Charterers' account and to be refunded to Owners by Charterers upon receipt of the Owners underwriters/brokers copy of original invoice/debit note and the copy of bank swift which owners has paid to underwriters debit note by fax.
Such additional/extra war risk insurance premium not to exceed that obtainable from first class insurers at Lloyd's of London on same terms and conditions as Owners cover.

**Clause 56.   BILL(S) OF LADING SIGN**
Charterers and/or their agent have the option to sign Bill of Lading on behalf of Master in accordance with Mate's receipts without prejudice to this Charter Party.

**Clause 57.   CLAUSE PARAMOUNTS**
New Jason Clause, New Both-to-Blame Collision Clause, and the Hague 1921 rules and Legislation's, Conwartime 1993 War Risk Clause, Chamber of Shipping Nuclear Clause, Clause Paramount, U.S.A., Clause Paramount, whenever applicable shall be deemed to be incorporated in this Charter Party and Bills of Lading issued hereunder.

**Clause 58.   NYPE INTERCLUB AGREEMENT**
Liabilities for cargo claims, including customs fines if imposed shall be borne by Owners/Charterers in accordance with the Interclub New York Produce Exchange Agreement of 1996 and any amendments thereto. The party having paid the claim shall submit to the other party supporting documents as soon as possible.

**Clause 59.   OWNERS P AND I CLUB**
Owners confirm the vessel is fully covered for the duration of Charterers' employment by "          ".

**Clause 60.**
In case Charterers load steel slabs, no California block stowage allowed.

**Clause 61.**
Owners warrant that vessel's hatch covers to be watertight all throughout this Charter period and if any hatch cover found defective, same to be rectified at Owners' time and expenses to Charterers' satisfaction. Charterers also have the right to carry out hose test on all hatches at any time during this Charter.

**Clause 62.**
NAABSA Clause as per NYPE to be deleted and replaced with "The countries where NAABSA to be applied shall be limited to River Plates, Brazil ports Argentina/Uruguay (River Plate/Up River), Buenaventura, Orinoco River only where it is customary for similar size vessels and Charterers undertake that the vessel can safely lie aground at all times of tide. Such trading shall be limited to maximum 4 voyages per year.

On occasions where the vessel needs to call other ports that customarily require NAABSA for similar size vessels, the same is subject to Owners' approval which not to be withheld unreasonably."

**Clause 63.   VESSEL'S DESCRIPTION "ALL DETAILS ABOUT WOG"**

MV. SEA TOPAZ
2010blt SDBC
32,484mt DWT, 10.2m SSW, ICE class - ID
Flag : PANAMA, CLASS KR
GRT/NRT : 20,198/11,367
LOA / LBP / BM 177.40 / 168.00 / 28.20
Grain 42149 cbm
TPC : 45.1
5/5/h/h
30t x 4 cranes
CO2 fitted

HOLD/HATCH/TANKTOP DIMENSIONS INCLUDING TANKTOP STRENGTHS

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

**TANK TOP STRENGTH (METRIC TONS PER SQM) 20 MT/SQM**
**STRENGTH OF HATCH COVERS IN METRIC TONS PER SQM**
**NO.1    4.87 MT / SQM**
**NO.2~5  3.50 MT / SQM**

**FLAT TANKTOP DIMENSION**
**NO.1 23.0 M X 5.4 M FWD X 20.2 M AFT**
**NO.2~4 25.4 M X 21.8 M**
**NO.5 26.1 M X 21.8 FWD X 8.4 AFT**

**HATCH SIZES:**
**NO. 1    14.4 M X 15.2 M**
**NO. 2 ~ 5 19.2 M X 21 M**

**GRAIN /BALE BDOWN IN CM**
 **NO. 1 6,196.6 / 6,010.7**
 **NO. 2 9,171.2 / 8,896.1**
 **NO. 3 9,232.5 / 8,955.5**
 **NO. 4 9,229.7 / 8,952.8**
 **NO. 5 8,319.2 / 8,069.6**
**TOTAL 42,149.2 / 40,884.7**

**Speed/Consumption at Sea**
**Laden - Abt 13.0 kts on abt 26.0 mt IFO (380CST) + abt 0.1 mt MGO**
**Ballast - Abt 13.5 kts on abt 26.0 mt IFO (380CST) + abt 0.1 mt MGO**
**In good weather conditions up to and including BF4 and DSS 3 and no negative swell / no adverse current the vessel entitles to use more IFO/MGO at narrow / shallow / busy water area, canals, in and out of ports and engine starting / stopping at masters discretion whenever necessary**

**eco speed WOG**
**abt 12.0 (L)/12.5 (B) kts on 20.0 mt FO + abt 0.1mt MGO**

**Port Consumption**
**Idle abt 3.8 mt IFO(380CST) + abt 0.1 mt MGO**
**Working abt 5.0 mt IFO(380CST) +  abt 0.1 mt MGO**

**All details about given in good faith without guarantee**

**Clause 64.   DELAY DUE TO OWNERSHIP**
**In the event that the vessel is delayed or rendered inoperative by strikes, labour stoppage or any other difficulties due to ownership, lack of health certificates of Officers/crew, such time lost to be considered as off-hire.**

**Clause 65.   RETURN INSURANCE**
**Charterers to have the benefit of any return insurance premium receivable by Owners from their Underwriters, as and when received from the Underwriters, by reason of the vessel being in port for a minimum period of 30 days, provided the vessel is on hire during the same period.**

**Clause 66. - Cancelling Clause**

**(a)  Should the Vessel not be ready on the agreed cancelling date, the Charterers shall have the option of cancelling this Charter Party.**

**(b)  Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.**

**Such option must be declared by the Charterers within 24 running hours after the receipt of the Owners' notice.  If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.**

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.

**Clause 67.**
Vessel not to trade Australia and U.S.A. on 1st voyage.

**Clause 68.**
Owners guarantee that vessel's holds are to be clear of any fittings/superstructures such as cardeck, curtain plates, container fitting whatsoever.

**Clause 69.**
BIMCO ISPS Clause (for Time Charter) to be incorporated into this Charter Party.
BIMCO Double Banking Clause to be applied.

**Clause 70.   OWNERS' FULL STYLE**
HANARO SHIPPING CO., LTD.,
1202, SEORIN BLDG 88, SEORIN-DONG, JONGRO-KU, SEOUL, KOREA
TEL: 82-2-735-1504 (REP)
FAX: 82-2-735-5420

**Clause 71.   CONSECUTIVE OFF-HIRE**
If the vessel is placed off-hire for more than 30 consecutive days other than for dry-docking purpose,   Charterers have the right to cancel the balance period of this Charter upon completion of the concerned voyage provided no cargo on board.

**Clause 72.   BIMCO DOUBLE BANKING CLAUSE**
(a)   The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transshipment, loading or discharging of cargo and/or bunkering.
(b)   The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.
(c)   Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do. The Master has the right at any time to order the other vessel away from his vessel or instruct his own vessel to sail if he considers it unsafe for vessel to remain double banked.
(d)   The Owners shall be entitled to insure any deductible under the vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the vessel's Underwriters and/or the cost of insuring any deductible under the vessel's hull policy.
(e)   The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The vessel shall remain on hire for any time lost including period for repairs as a result of such operation.

**Clause 73.   Lien Clause for Time Charter**

In addition to the right of lien conferred on the Owners according to the provisions of the charter-party lien clause, the Owners also to have a lien over bunkers on board, as well as over any sums due to Time Charterers under any sub-charterparties (in addition to freights and sub- freights), for any amounts due under this charter-party. Further, in the event of the Owners' exercise of their liberty to withdraw the vessel in accordance with the provisions of the charter-party withdrawal clause, the ownership of any bunkers remaining on board shall thereupon vest in Owners, who shall allow to Time Charterers by way of credit against any sums due to Owners the value of such bunkers calculated in accordance

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

**Clause 74.   REPLENISHMENT OF BUNKER BEFORE DELIVERY AND REDELIVERY**
Charterers to be allowed to replenish bunkers before delivery and Owners to be allowed to replenish bunkers before redelivery provided such bunkering does not interfere with each parties' cargo operations.

**Clause 75.   Bunker Quality Control Clause**
(1) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this Charter.

(2) At the time of delivery of the Vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.

(3) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the Vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the Vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the Vessel.

(4) The fuel samples shall be retained by the Vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by (...) or by another mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

(5) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

**Clause 76.   Bunker Fuel Sulphur Content Clause**

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content
when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authoritie

**Clause 77.**
Hire not to contribute General Average and this Charter Party shall be governed by and construed in accordance with English law.

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

**Clause 78.**
Charterers are to have the option of welding padeyes and angles, except on fuel tank tops, at their own arrangement/expense/time. Charterers to remove all padeyes and angles before redelivery unless Owners request Charterers to maintain same without removal.

Any extra fitting required on the tanktop, deck or hatch cover to be provided, installed and paid for by the Charterers. Such extra fitting to be removed from the Vessel and the coating to be restored to Master`s satisfaction by the Charterers at their time and at their expense prior to redelivery.

**Clause 79.   OWNERS' BANK ACCOUNT DETAILS:**

**Clause 80.   HIRE PAYMENT CLAUSE**

**(a) Payment   -**
Payment of Hire shall be made so as to be received by the Owners or their designated payee "SEE CL.77" in United States Currency, in funds available to the Owners on the due date, every 15 days in advance, and for the last 15 days month or part of same the approximate amount of hire, and should same not cover the actual time, hire shall be paid for the balance day by day as it becomes due, if so required by the Owners.   Failing the punctual and regular payment of the hire, or on any fundamental breach whatsoever of this Charter Party, the Owners shall be at liberty to withdraw the Vessel from the service of the Charterers without prejudice to any claims they (the Owners) may otherwise have on the Charterers.

At any time after the expiry of the grace period provided in Sub-clause 11 (b) hereunder and while the hire is outstanding, the Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold the performance of any and all of their obligations hereunder and shall have no responsibility whatsoever for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners, and hire shall continue to accrue and any extra expenses resulting from such with holding shall be for the Charterers' account.

**(b) Grace Period**

Where there is failure to make punctual and regular payment of hire due to oversight, negligence, errors or omissions on the part of the Charterers or their bankers, the Charterers shall be given by the Owners 24 running hours (as recognised at the agreed place of payment) written notice to rectify the failure, and when so rectified within those 24 running hours following the Owners' notice, the payment shall stand as regular and punctual. Failure by the Charterers to pay the hire within 48 running hours of their receiving the Owners' notice as provided herein, shall entitle the Owners to withdraw or withhold service as set forth in Sub-clause 11 (a) above.

**(c) Last Hire Payment**

Should the Vessel be on her voyage towards port of redelivery at the time the last and / or the penultimate payment of hire is/are due, said payment(s) is/are to be made for such length of time as the Owners and the Charterers may agree upon as being the estimated time necessary to complete the voyage and taking into account bunkers actually on board, to be taken over by the Owners and estimated disbursements for the Owners' account before redelivery.   Should same not cover the actual time, hire is to be paid for balance, day by day, as it becomes due.   When the Vessel has been redelivered, any difference is to be refunded by the Owners or paid by the Charterers, as the case may be.

**Clause 81. Deleted**

**Clause 82.   HOLD READINESS CLAUSE**
Vessel's holds upon arrival at 1st loadport to be clean swept/washed down by fresh water and dried up so as to receive Charterers' intending cargo(es) in all respects, free of salt and rust scale and previous cargo residues to the satisfaction of independent surveyors. If vessel fails the inspection, vessel to be placed off-hire from the time of rejection until the vessel is fully accepted and direct related expenses incurred due to inspection failure to be for Owners' account.

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

Charterers' option to commence loading from the hold passed on hold inspection, if the hold(s) is(are) partly accepted in which case time to be counted pro-rata.

**Clause 83.   LETTER OF INDEMNITY CLAUSE**
In case original Bills of Lading are not available at discharging port, Owners/Master to discharge the cargo(es) against Charterers' Letter of Indemnity in accordance with Owners' P and I Club form and wording, which to be signed by Charterers only.

In case of the change of the discharge port in Bill(s) of Lading, Owners allow Charterers to discharge the cargo(es) at a new discharge port(s) and Charterers to provide Letter of Indemnity as per Owners' P and I Club form and wording. Letter of Indemnity to be signed by Charterers only.

**Clause 84**
**DELETED**

**Clause 85.   GRAIN FITTING**
Vessel shall be in all respects fitted for grain loading and has necessary certificate for grain loading in accordance with the requirements of 'SOLAS'.

**Clause 86.   GENERAL AVERAGE/ARBITRATION**
General Average/Arbitration to be held in London and English law to apply.

**Clause 87.   DELIVERY/REDELIVERY**
For the purpose of computing hire payments, time for delivery/redelivery shall be adjusted to Greenwich Mean Time.

**Clause 88.   TRADING EXCLUSIONS**
A) The vessel shall be employed only in lawful trades for the carriage of suitable lawful merchandise only specifically excluding, however, any places to which trading is prohibited by the country of the vessel's registry and/or the country of Owners' incorporation, as well as excluding any places, trading to which, would restrict the vessel's qualifications to trade to the U.S.A. (including but not limited to Gypsy Moth Regulations) or would subject the vessel to forfeiture, penalty or increased tonnage taxes under the laws of the U.S.A., excluding any area(s) and/or countries banned and boycotted by the United Nations, countries or places where war or war-like situation exists and any other countries prohibited from calling by the flag state. Such exclusion from trading limits now comprises Angola (including Cabinda), Israel, Lebanon, Eritrea, Somalia, Democratic Republic of Congo (formerly Zaire), Liberia, Albania, Sierra Leone, Cambodia, North Korea, Cuba, Iraq, Ivory Coast, Gabon, Georgia including Abkhazia, Kampuchea, Nigeria, Ethiopia, El Salvador, Laos, Nicaragua, New Guinea, Scandinavia, Sudan, all territories in Russian Pacific and/or any place which is classified as being high risk Asian Gypsy Moth area, all war and warlike zones, as defined by the war risk clause (CONWARTIME 93) contained in this Charter Party.

Owners shall keep Charterers advised of any changes in trading exclusions by reason of ownership. Charterers are not allowed to trade the vessel directly between the People's Republic of China (PRC) and Taiwan, North and South Korea or vice versa and to trade the vessel to ports/areas which are prohibited from trading by the United Nations. If an area to which vessel is bound becomes a war zone or warlike zone after commencement of the voyage, the war clause (CONWARTIME 93) of this Charter Party shall apply.

"Nevertheless Charterers have option to trade all Japanese port subject to Charterers to arrange for Phytosanitary inspection to be carried out and Phytosanitary certificate valid for all countries issued by official inspectors to be placed on board, the vessel at Charterers time and expense prior to vessel's sailing from the load port."

B) Basic war risk insurance premium for world wide trading to be for Owners' account but additional war risk premium by reason of the vessel to call Charterers' intended port and other exclusion areas specified by Owners' Underwriters to be for Charterers' account. Crew war bonus if any to be paid directly to Owners by Charterers but not exceeding EWRI.

**Clause 89.   CARGO EXCLUSIONS**
A) The vessel shall be employed in carrying lawful merchandise excluding any goods of a dangerous, injurious, flammable or corrosive nature regulated by IMO rules. Without prejudice to the generality of the foregoing, in

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

addition, the followings are specifically excluded:
livestock or any description, arms; ammunition, explosives (black powder, blasting caps, detonators, loaded bombs, cement, cement clinker, dynamite and TNT), turning and motor blocks, nuclear and radioactive materials and its waste, petroleum and its by-products (bagged paraffin wax allowed), pitch in bulk, calcium hydrochloride, fishmeal, bonemeal, charcoal, turpentine, ferro-silicon, seed cake, oil cake, chilean nitrate, copra, pond coal, pebbles, sponge iron, asphalt, sunflower seeds, alumina, ammonium nitrate, naphtha and its products, direct reduced iron, HBI, asbestos, hides, creosoted goods, calcium carbide, acids, motor spirits, bitumen (for the forms classified as dangerous cargo),  tar in bulk, carbon black, grain, quebracho, industrial waste, nuclear fuels, spent oxide, caustic soda, meat bone meal, zinc ashes, brown coal, borax, borings, calcium oxide, calcium nitrate, castor beans, calcium hypochlorite, copra products, cotton, cement in bulk, containers, chrome products, expellers, inflammable cargo, iron oreswaf, logs, iron oxide, iron sponge, kaolin, lead nitrate, military equipment, mobile homes, modular holes, naptha, pitch, pet coke, pyrites, refrigerated cargo, rutile sand, soda ash, sulphur, tar and its product, technical urea, talc, ziron sand, bulk cargoes identified by group "B" of BC - code (except coal (MHB) and metal sulphide concentrates (MHB)), any dangerous cargoes in IMDG.

.

B) Any concentrates to be loaded in accordance with IMO regulations. Before vessel's sailing, Charterers to supply certificates stating transportable moisture content and same to be within safe levels as defined in the regulations mentioned.

Charterers  warrant that all cargoes to be loaded/stowed/carried and discharged in strict conformity with vessel's certificates, IMO and local regulations, BC-code(bulk cargoes), cargo securing manual (general cargoes) and vessel's stability information. Any extra fittings/equipment/etc which are required to observe such regulations to be undertaken by Charterers at their time/expenses.

C) IMO/IMDG cargoes, excluding classes 1 plus 7, allowed upto MAX 2,000 MT per voyage with Owners' prior consent which not to be unreasonably withheld, provided same stowed, carried, packed, labelled, loaded, discharged in accordance with IMO/IMDG regulations.

D) Pig Iron Protecting cl.

    A) Charterers undertake to use holds as few as possible, provided vessel stability and strength permitting.

    B) Charterers undertake that loading of first layer of pig iron to be released as lower as possible to close to tanktop and not to be dumped/dropped during loading, so as to provide a cushion flooring for the balance of cargo under the master's supervision and his reasonable satisfaction.

    C) In case during en route from loading to discharging port, cargo was found to shift which may affect the seaworthiness or safety of the vessel, Owners have the right to call at nearest port for necessary cargo trim, all time/expenses incurred to be for Charterers' account and vessel to remain on hire for period.

Clause 90.   DOCUMENTATION CLAUSE

1) Owners warrant that throughout the currency of this Charter they will provide the vessel with the following certificates.
Certificate issued pursuant to section 1002 of the Oil Pollution Act 1990 and Section 107 of the Comprehensive Environmental Response, Compensation and Liability Act 1980 as amended in accordance with Part 108 of Coast Guard Regulation 33 CFR.

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

2) Notwithstanding anything whether printed or typed herein to the contrary.
    a)   Save as required for compliance with paragraph (1) hereof, Owners shall not be required to establish or maintain financial security or responsibility in respect of oil, or other pollution damage to enable the vessel lawfully to enter remain in or leave any port, territorial or contiguous waters of any country, state or territory in performance of this Charter.
    b)   Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or water, Owners that to the extent provided in paragraph (1) hereof.
    c)   Owners shall not be liable for any loss, damage, liability or expense whatsoever.  And howsoever arising which Charterers and/or the holders of any Bills of Lading issued pursuant to this Charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter remain in or leave any port, place or waters, other than to the extent provided in paragraph (1) hereof.

3) Charterers warrant that the terms of this clause will be incorporated effectively into any Bill(s) of Lading issued pursuant to this Charter.

**Clause 91.**
Owners confirm that the vessel has onboard the International Tonnage Certificate 1969 in full accordance with IMO requirements and the International Convention of Tonnage Measurement of Ships 1969.

**Clause 92.**
All negotiations and eventual fixture are to be kept strictly private and confidential.

**Clause 93.   SCRAP PROTECTIVE CLAUSE**
1) When loading scrap cargo, always excluding motor blocks and turnings, non oily, to be loaded the first load/layer of scrap to be lowered as low/close as possible to bottom of the hold so as to provide a proper flooring and cushion for loading balance cargo to Master's satisfaction
2) Prior to loading scrap, a hold condition survey to be conducted by an independent surveyor at Charterers' expense and time and same to be done immediately after completion of discharge
3) In case of any damage to the vessel's holds and/or Australian hold ladders and/or others caused by loading such scrap cargo, Charterers to be responsible for upgrading/repairing to bring the hold and Australian ladders into same condition as prior to loading scrap cargo, before commencement of next voyage.

**Clause 94.   TAXES**
All tax(es), dues and charge(s) on cargo and/or freight arising out of cargoes carried or port(s) visited under this Charter Party to be for Charterers' account.

**Clause 95.   ASIAN GYPSY MOTH CLAUSE**
DELETED

**Clause 96.**
No deductions to be made towards galley fuel including fuel used for air-conditioning - vessel has electric galley on board.

**Clause 97.**
Owners confirm that vessel is not black listed by any Arab league countries.

**Clause 98.**
Vessel has in its possession a current ITF certificate or equivalent acceptable to the International Transport Workers Federation.

**Clause 99.**
Master to authorize Charterers in writing on arrival load port to sign and issue Bill(s) of Lading strictly in

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

conformity with Mate's Receipt without prejudice to this Charter Party but Charterers to hold Owners harmless and indemnify Owners against all consequences arising from Charters signing Bill(s) of Lading.

**Clause 100.   Deleted.**

**Clause 101.   Deleted.**

**Clause 102.**
Charterers are entitled to load cargo on deck/hatch cover in accordance with normal marine practice and safety regulations and always subject to vessel's seaworthiness, strength, stability and safety of crew. Deck/hatch cover cargoes to be entirely at charterers/shippers/receivers risk, time and expense. Deck/hatch cover cargoes to be loaded, stowed, lashed and secured to master's satisfaction. Extra expenses and/or detention/deviation if any due to deck/hatch cover cargoes to be for charterers account. All bills of lading for deck/hatch cover cargoes to be claused  "shipped on deck/hatch covers at charterers, shippers and receivers risk, expense and responsibility without any liability and/or responsibility on the part of the vessel or her owners for any loss, damage, expense and/or delay howsoever caused."

**Clause 103. OCEAN ROUTE CL.**

Vessel's speed and consumption under this Charter Party are under good weather conditions up to Beaufort wind force 4 and Douglas sea state 3. The Charterers have the option to appoint a weather routing company (AWT or WNI) at their expense to advise the Master. The Master is to follow their suggestions concerning navigation routes, but the Master at his reasonable discretion, may not follow the suggested routes, in which case he has to detail in log book the reason for not following such suggested routes. In the event of consistent discrepancy between vessel's logs and Ocean Routes then Owners and Charterers mutually agree to appoint another Ocean Routes company and the Ocean Routes report of another company to be final and binding..

In the event of any speed claims fuel savings, if any, due to reduced speed is to be considered and set off as credits against such claims.   Charterers to provide supporting documents to substantiate their speed claims, if any, and same to be dealt with separately and not to be deducted from hire unless mutually agreed

**Clause 104.**
Charterers have the option of breaking "Institute Warranty Limits" with Owners' prior permission which not to be unreasonably withheld against paying additional insurance premium on presentation of vouchers.

**Clause 105.**
From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and the company (as defined by ISM code) shall comply with the requirements of ISM code.   Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to Charterers.
Except as otherwise provided in this Charter Party, loss, damage, expenses or delay caused by failure on the part of the Owners or "The Company" to comply with the ISM code shall be for the Owners' account.

**Clause 106.   Deleted.**

**Clause 107.   COMMUNICATION FEE**
Charterers to pay USD1,500 per 30 days or pro rata for covering all cables, entertainment, victualling.

**Clause 108.   DRY DOCK CLAUSE**
Owners have the right to place the vessel in drydock during the currency of this Charter for bottom cleaning and painting and/or repair as required by class or dictated by circumstances, provided, however, that Owners have the right to place the vessel in drydock at any time and any place in case of emergency. Charterers must bring the vessel to a port within the range between Japan and Singapore. Owners will give Charterers four (4) months prior notice with regard to the placing of the vessel in drydock. The off hire period shall be the balance period between the actual time elapsed (last discharging port-dock-Charterers' nominated port) and the estimated time required under the artificial voyage going straight from the last discharging port to the first loading port. The bunkers consumed to be calculated in the same manner, unless otherwise mutually agreed.

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

Charterers' option to add off hire period, arising from dry-docking, on charter period which to be declared by Charterers within one month after dry dock.

**Clause 109. BIMCO Piracy Clause**

(a) The Vessel shall not be obliged to proceed or required to continue to or through, any port, place, area or zone, or any waterway or canal (hereinafter "Area") which, in the reasonable judgement of the Master and/or the Owners, is dangerous to the Vessel, her cargo, crew or other persons on board the Vessel due to any actual, threatened or reported acts of piracy and/or violent robbery and/or capture/seizure (hereinafter "Piracy"), whether such risk existed at the time of entering into this charter party or occurred thereafter. Should the Vessel be within any such place as aforesaid which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(b) If in accordance with sub-clause (a) the Owners decide that the Vessel shall not proceed or continue to or through the Area they must immediately inform the Charterers. The Charterers shall be obliged to issue alternative voyage orders and shall indemnify the Owners for any claims from holders of the Bills of Lading caused by waiting for such orders and/or the performance of an alternative voyage. Any time lost as a result of complying with such orders shall not be considered off-hire.

(c) If the Owners consent or if the Vessel proceeds to or through an Area exposed to the risk of Piracy the Owners shall have the liberty:

(i) to take reasonable preventative measures to protect the Vessel, her crew and cargo including but not limited to re-routeing within the Area, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel or equipment on or about the Vessel;

(ii) to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the terms of the insurance;

(iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group, including military authorities, whatsoever acting with the power to compel compliance with their orders or directions; and

(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by  the Vessel proceeding as aforesaid, save to the extent that such claims are covered by additional insurance as provided in sub-clause (d)(iii).

(d) Costs

(i) If the Vessel proceeds to or through an Area where due to risk of Piracy additional costs will be incurred including but not limited to additional personnel and preventative measures to avoid Piracy, such reasonable costs shall be for the Charterers' account. Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers' account and the Vessel shall remain on hire;

(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers;

(iii) If the underwriters of the Owners' insurances require additional premiums or additional insurance cover is necessary because the Vessel proceeds to or through an Area exposed to risk of Piracy, then such additional insurance costs shall be reimbursed by the Charterers to the Owners;

(iv) All payments arising under Sub-clause (d) shall be settled within fifteen (15) days of receipt of Owners' supported invoices or on redelivery, whichever occurs first.

(e)    If the Vessel is attacked by pirates any time lost shall be for the account of the Charterers and the Vessel shall remain on hire.

(f)    If the Vessel is seized by pirates the Owners shall keep the Charterers closely informed of the efforts made to have the Vessel released. The Vessel shall remain on hire throughout the seizure and the Charterers' obligations

13

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

shall remain unaffected, except that hire payments shall cease as of the ninety-first (91st) day after the seizure and shall resume once the Vessel is released. The Charterers shall not be liable for late redelivery under this Charter Party resulting from seizure of the Vessel by pirates.

(g) If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party. In the event of a conflict between the provisions of this Clause and any implied or express provision of the Charter Party, this Clause shall prevail to the extent of such conflict, but no further.

**Clause 110.   Bottom Fouling Clause**

(a)   If, in accordance with Charterers' orders, the Vessel remains at or shifts within a place, anchorage and/or berth for an aggregated period exceeding:

    (i)   15 days in a Tropical Zone or Seasonal Tropical Zone; or

    (ii)   20 days outside such Zones any warranties concerning speed and consumption shall be suspended pending inspection of the Vessel's underwater parts including, but not limited to, the hull, sea chests, rudder and propeller.

(b)   In accordance with sub-clause (a), either party may call for inspection which shall be arranged jointly by Owners and Charterers and undertaken at Charterers' risk, cost, expense and time.

(c)   If, as a result of the inspection either party calls for cleaning of any of the underwater parts, such cleaning shall be undertaken by the Charterers at their risk, cost, expense and time in consultation with the Owners.

    (i)   Cleaning shall always be under the supervision of the Master and, in respect of the underwater hull coating, in accordance with the paint manufacturers' recommended guidelines on cleaning, if any. Such cleaning shall be carried out without damage to the Vessel's underwater parts or coating.

    (ii)   If, at the port or place of inspection, cleaning as required under this Sub-clause (c) is not permitted or possible, or if Charterers choose to postpone cleaning, speed and consumption warranties shall remain suspended until such cleaning has been completed.

    (iii)   If, despite the availability of suitable facilities and equipment, Owners nevertheless refuse to permit cleaning, the speed and consumption warranties shall be reinstated from the time of such refusal.

(d)   Cleaning in accordance with this clause shall always be carried out prior to redelivery. If, nevertheless, Charterers are prevented from carrying out such cleaning, the parties shall, prior to but latest on redelivery, agree a lump sum payment in full and final settlement of Owners' costs and expenses arising as a result of or in connection with the need for cleaning pursuant to this clause.

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

(e)   If the time limits set out in Sub-clause (a) have been exceeded but the Charterers thereafter demonstrate that the Vessel's performance remains within the limits of this Charter Party the vessel's speed and consumption warranties will be subsequently reinstated and the charterers' obligations in respect of inspection and/or cleaning shall no longer be applicable.

**Clause 111.   CONMARTIME 1993**
Code Name "CONWARTIME 1993" to be included in this Charter Party.

(1) For the purpose of this Clause, the words :
(a) "Owners" shall include the shipowners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the vessel, and the Master, and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crew or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

(2) The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks.   Should the vessel be within any such place as aforesaid, which only become dangerous, or is likely to be or to becomes dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4) (a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be or their account.

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The vessel shall have liberty : -
(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions :

(b) to comply with the order, directions or recommendations of any war risks Underwriters who have the authority to give the same under the terms of the war risks insurance :

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement ;

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

(d) to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier,

(e) to divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers.

No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

**Clause 112.   BULK CARRIER SAFETY CLAUSE**
(A) The Charterers shall instruct the terminal operators or their representatives to co-operate with the Master in completing the IMO ship/shore safety checklist and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(B)    In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/discharging rates, the Charterers shall instruct the terminal operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

(C)   At any time during cargo operations the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the terminal operators or their representatives to slow down or stop the loading or discharging.

(D)   Compliance with the provisions of this clause shall not affect the counting of hire.

**Clause 113.   U.S. TAX REFORM 1986 CLAUSE**
Any U.S. gross transportation tax as enacted by the United States Public law 99-514, (also referred to as the U.S. tax reform act of 1986), including later changes or amendments, levied on income attributable to transportation under this Charter Party which begins or ends in the United States, and which income under the laws of the United States is treated as U.S. source transportation gross income, shall be reimbursed by the Charterers.

**Clause 114.   U.S. TRADE – UNIQUE BILL OF LADING IDENTIFIER CLAUSE**
The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a unique Bill of Lading identifier as required by the U.S. customs regulations (19 CFR part 4 section 4.7.A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.
Non-compliance with the provisions of this clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.
Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this clause shall be for the Charterers' account.

**Clause 115.   HAMBURG RULES CHARTER PARTY CLAUSE**
Neither the Charterers nor their agents shall permit the issue of any Bill of Lading, Waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owner or on the Charterers' behalf or on behalf of any sub-Charterers) incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague/Visby Rules.
Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

16

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

**Clause 116. U.S. ANTI DRUG ABUSE ACT 1986 CLAUSE FOR TIME CHARTERS**
**(A)**   In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the vessel.
**Non-compliance with the provisions of this clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the master and the crew of the vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.**
**Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this clause shall be for the Charterers' account and the vessel shall remain on hire.**
Should the vessel be arrested as a result of the Charterers' non-compliance with the provisions of this clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the vessel is released and at their expense put up bail to secure release of the vessel.
**The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the vessel's personnel.**

**(B)**   In pursuance of the provisions of sub-clause (a) above, the Owners and the Charterers warrant that they shall both become signatories to the sea carrier initiative agreement on signing this Charter Party or on delivery of the vessel under this Charter, whichever is the earlier, and will so remain during the currency of the Charter.

**Clause 117.   U.S. SECURITY CLAUSE FOR TIME CHARTERING**
If the vessel calls in the Unite States, including any U.S. territory, the following provisions shall apply with respect to any applicable security regulations or measures:
Notwithstanding anything else contained in this Charter Party all costs or expenses arising out of or related to security regulations or measures required by any U.S. authority including, but not limited to security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence.

**Clause 118.**
It is expressly agreed that during the currency of this Charter Party no through Bills of Lading are to be issued.

**Clause 119.**
The separation between cargoes, other than natural, to be for Charterers' account/risk and expense.

**Clause 120.   SAFE STOWAGE AND TRIMMING**
Charterers are to leave the vessel in safe and seaworthy trim and with cargo on board safely stowed, dunnaged and secured to the Master's satisfaction for all shiftings between berths and all passages between ports under this Charter in their time and at their expenses.

**Clause 121.**
Vessel to be delivered with valid and up to date vessel's special cargo gear certificate to call in Saudi Arabia on board and if this does expire during the whole period of this Charter Party and renewal of certificates is necessary, loss of time and delay of vessel and any expenses included therefrom to be for Owners' account. The same certificate shall provide to Charterers in any time/places during this Charter Party period if required by Charterers. Owners guarantee to submit cargo gear certificate for calling Saudi Arabian ports from six major class ( I.E. DNV/BV/GL/LR/NK/ABS) at Charterers' first loading port. Loss of time and delay of vessel and any expenses included therefrom to be for Owners' account.

**Clause 122.**
Charterers have the option to embark a forklift, six(6) units of running plates and six(6) persons of stevedores for dispatch. They will stay on vessel during loading operation and will move with vessel between port and port. Owners provide about one drum of fresh water per day for stevedore at loading port.

**Clause 123.**
Owners warrant that:-
(01) Vessel is fully fitted for Australian trading and ITF/WWF/AHL fully in order throughout the currency of this

17

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

Charter Party.   Not applicable.
(02) Vessel is gypsy moth free and has not called Russian/C.I.S. pacific ports last 24 months.   Not applicable.
(03) If Owners choose to sell the Vessel to new Owners/managers to be subject to Charterers' approval before final sales, which not to be unreasonably withheld.   Yes
(04) Vessel has in its possession a current ITF certificate or equivalent acceptable to the International Transport Workers Federation.   Yes
(05) Vessel is not subject to any outstanding ITF.   Not applicable.
(06) Vessel to have watertight hatches and to have onboard valid and sufficient calibration scales in order to perform a proper draft survey through this charter party.   Yes
(07) Vessel's hull and machinery insurance shall be fully maintained and will not be changed.   Yes
(08) Vessel is fully P&I covered which shall be maintained.   Yes
(09) Vessel to be classified 100 + a1 at Lloyds or equivalent.   Yes
(10) Vessel has maintained to standard acceptable to Australian maritime safety survey requirements.   Not applicable.
(11) Vessel is to comply with the requirements of the ISM code. Owners hereby agree that any loss, damage, costs, liability and expense arising from failure to maintain compliance with the code will be for Owners' account and agree to hold harmless and indemnify Charterers accordingly. Owners agree that the Vessel will be off hire during any such non-compliance.   Yes
(12) Vessel will not be scheduled for break up or sold for scrap upon completion of this charter.   Yes
(13) Vessel has no deep tanks or compartments that were originally constructed as deep tanks or reefer space or special cargo locker space and is guaranteed suitable for grab discharge.   Yes
(14) The Vessel strengthened for heavy cargoes and capable of alternate loading.   Yes
(15) The Vessel is suitable for loading full cargo of grain in bulk without any bagging/ securing/strapping and additional trimming for untrimmed ends in accordance with latest SOLAS regulations. Vessel can sail with slack holds subject in accordance with provisions of approved booklet for carriage of grain retained on board. Vessel has on board all grain loading certificates and documents issued by recognised classification society including regulations for filled holds ends untrimmed. any time and expenses due to non-compliance with above are fully for Owners' account.   Yes
(16) Owners guarantee that vessel's holds are to be clear of any fitting/super structures such as cardeck, curtain plates, container fitting whatsoever.   Yes
(17) Owners guarantee that vessel is fully fitted with ITF/WWF/AHL/Australia gear clause in good order. Not applicable.   Yes
(18) Owners guarantee that tank top to be flat and suitable for grabs/bulldozers discharging.   Yes
(19) Owners guarantee that vessel is SDSTBC and engine/bridge after.   Yes
(20) No central line beam, bulkheads or any obstruction in holds.   Yes
(21) Owners guarantee that vessel is not blacklisted by trading countries due to vessels flag, ownership, crew, etc.   Yes
(22) Owners guarantee that vessel has not relation to ex-Yogoslavia in vessels flag, ownership, crew, etc.   Yes
(23) with regards to oil pollution, Owners guarantee a valid certificate of financial responsibility in compliance with requirements of U.S. Water Quality Improvement Act of 1970 and OPA 90 and any amendments thereto.   Not applicable.   Yes
(24) California certificate of financial responsibility to be arranged by Owners.   Not applicable.
(25) BIMCO ISM clause to be applied.   Yes
(26) BIMCO Y2K clause to be applied .   Yes
(27) BIMCO Standard ISPS code clause to be applied after 1st of July 2004.   Yes


Clause 124.
If steel coils are loaded, owners will allow charterers to load steel coils as per steel loading manual within vessel's permissible tanktop strength.

With the view to protect Owners and Charterers against possible claims for cargo damages, the Owners have the option to appoint surveyors nominated b their P & I Club to perform cargo condition surveys concurrently with loading and discharging certain cargoes such as steel, and other cargoes which are potentially liable to cargo claims. Cost for such surveys to be for shared by charterers and owners.

Cargo claims as between the owners and the Charterers shall be governed by, secured, appointed and settled fully in accordance with the provisions of inter-club New York Produce Exchange Agreement of February 1970 as amended May 1984 and September 1996 and September 2011 or any subsequent modification or replacement thereof. This Clause shall take precedence over any other clause or clauses in the charter party purporting to incorporate any other version of the Inter-Club new York Produce Exchange Agreement into the charter party. The party having paid the claims(s) small submit same to the other party with supporting documents as soon as possible.

Clause 125.

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

**Owners guarantee that she is fully fitted $CO_2$ system in holds.**

**Clause 126.**
**U.S. Customs Advance Notification / AMS (Automated Manifest System) Clause to be applied.**

-     E     N     D     -

# RIDER CLAUSES TO M.V. "SEA TOPAZ"
# CHARTER PARTY DATED 24TH JULY 2013

### NEW JASON CLAUSE

In the event of accident, danger, damage, or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

### NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this charter party fails to be determined in accordance with the laws of the united states of America, the following clause shall apply : -

### BOTH TO BLAME COLLISION CLAUSE

If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the vessel, the owners of the cargo carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying vessel or carrier.

The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in additional to, the colliding ships or objects are at fault in respect to a collision or contract.